## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) Chapter 15 |
| PT HOLDCO, INC., *et al.,*[1] | ) |
| | ) Case No. 16-10131 (___) |
| | ) |
| Debtors in a Foreign Proceeding. | ) (Joint Administration Requested) |
| | ) |

## VERIFIED PETITION FOR RECOGNITION OF
## FOREIGN MAIN PROCEEDING AND RELATED RELIEF

FTI Consulting Canada Inc. ("FTI" or the "Monitor") is the court-appointed monitor and duly authorized foreign representative for PT Holdco, Inc., PTUS, Inc. Primus Telecommunications, Inc., Lingo, Inc., and Primus Telecommunications Canada Inc. (collectively, the "Debtors") in Canadian insolvency proceedings (the "Canadian Proceeding") pending in Canada before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court").[2]  The Monitor, on behalf of the Debtors, by and through its undersigned counsel, Elliott Greenleaf, P.C., has commenced this chapter 15 case ancillary to the Canadian proceedings with the filing of the Official Form 401 Petition under chapter 15 of title 11 of the United States Code (the "Bankruptcy Code") for each of the Debtors, and files this Verified Petition for Recognition of Foreign Main Proceeding and Related Relief (the "Petition for

---

[1] The last four digits of the Employer Identification Number or Canadian Business Number, as appropriate, for each debtor follow in parentheses: PT Holdco, Inc. (3731), PTUS, Inc. (0542), Primus Telecommunications, Inc. (4563), Lingo, Inc. (7778), and Primus Telecommunications Canada, Inc. (5618).

[2] The Monitor was appointed as monitor of the Debtors pursuant to provisions of Canada's Companies' Creditors Arrangement Act (the "CCAA"), R.S.C. 1985, c. C-36, the statute under which the Debtors have been granted relief from creditors.  An initial order was entered on January 19, 2016 in the Ontario Superior Court of Justice by the Honourable Mr. Justice Penny, Court File No. CV-16-11257-OOCL, In the Matter of a Plan of Compromise or Arrangement of PT Holdco, Inc., Primus Telecommunications Canada Inc., PTUS, Inc. Primus Telecommunications, Inc., and Lingo, Inc. ("Initial Order").

Recognition") pursuant to section 1515 of the Bankruptcy Code seeking (i) entry of an Order recognizing the Canadian Proceeding as a foreign main proceeding pursuant to section 1517 of the Bankruptcy Code, and (ii) relief under sections 1520 and 1521 of the Bankruptcy Code. In the alternative, if for any reason the Court finds that the Canadian Proceeding is not eligible for recognition as a foreign main proceeding as to any of the Debtors, the Monitor seeks recognition of a foreign non-main proceeding as to such entity, as defined in section 1502(5) of the Bankruptcy Code, and seeks relief under section 1521 of the Bankruptcy Code.

## PRELIMINARY STATEMENT

1.      The Order appointing the Monitor in the Canadian Proceeding was entered on January 19, 2016 (the "Initial Order"). The Monitor has filed an Official Bankruptcy Form 401 petition for each of the Debtors, this Petition for Recognition, along with a separate motion for provisional relief.

2.      Pursuant to section 1515(b) of the Bankruptcy Code, a certified copy of the Initial Order appointing the Monitor and authorizing the Monitor to act as foreign representative in these chapter 15 proceedings is attached hereto as **Exhibit A**. Pursuant to section 1515(b) of the Bankruptcy Code and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), a statement of all foreign proceedings with respect to the Debtors known to the Monitor, a list of all litigation in which any of the Debtors are parties in the United States which is known to the Monitor, and a list of all entities against whom provisional relief is being sought under section 1519 of the Bankruptcy Code, is attached hereto as **Exhibit B**, and was filed with each Official Form 401 for the Debtors.

3.    This Petition is also supported by the Declaration of Nigel D. Meakin, (the "Meakin Declaration"), and the exhibits annexed thereto, which has been filed concurrently with this petition.  Mr. Meakin is a Senior Managing Director of FTI.

4.    The Monitor is the authorized foreign representative of the Debtors, and as such is entitled to petition this Court directly for recognition of the Canadian Proceeding under section 1509 of the Bankruptcy Code.    The Canadian Proceeding qualifies as a "foreign main proceeding" under section 1502(4) of the Bankruptcy Code because it is pending in Ontario, Canada, and Ontario is the "center of main interests" for the Debtors.

5.    Because (i) recognition of the Canadian Proceeding would not be contrary to public policy under section 1506 of the Bankruptcy Code, (ii) the Canadian Proceeding is a foreign main proceeding under section 1502(4) of the Bankruptcy Code, (iii) the Monitor is a "person" pursuant to section 101(41) of the Bankruptcy Code, and (iv) the Monitor has complied with all requirements of section 1515 of the Bankruptcy Code and Bankruptcy Rule 1007(a)(4), the Monitor is entitled to entry of an order recognizing the Canadian Proceeding as a foreign main proceeding under section 1517(b)(1) of the Bankruptcy Code, and is further entitled to the relief set forth in sections 1520 and 1521 of the Bankruptcy Code.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157 and 1334, the *Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2013* (the "Order of Reference"),[3] and sections 109 and 1501 of

---

[3] Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final judgment or order with respect to this Petition for Recognition if it us determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

the Bankruptcy Code. Venue of this proceeding is proper in this judicial district pursuant to 28 U.S.C. § 1410. This is a core proceeding under 28 U.S.C. § 157(b)(2)(P).

## FACTUAL BACKGROUND

**A.    Corporate Structure**

7.      Holdco is a private company incorporated under the Ontario *Business Corporations Act*, R.S.O. 1900, c. B. 16 (the "OBCA"). Holdco holds 100% of the shares of Primus Canada and PTUS. Holdco's registered head office is located at 5543 Dundas Street West, Suite 400, Toronto, Ontario.

8.      Primus Canada is a private company incorporated under the OBCA. Primus Canada is the Primus Entities' Canadian operating company. Primus Canada's registered head office is located at 5343 Dundas Street West, Suite 400, Toronto, Ontario.

9.      PTUS is a subsidiary of Holdco and a private company incorporated under the laws of Delaware. PTUS holds 100% of the shares of PTI and Lingo, and has no independent operations. PTUS's registered head office is located at 2711 Centreville Road, Suite 400, Wilmington, New Castle County, Delaware.

10.      PTI is a private company incorporated under the laws of Delaware. PTI is in the business of selling telecommunications services primarily consisting of telephone and long distance voice services. PTI's registered head office is the same as PTUS.

11.      Lingo is a private company incorporated under the laws of Delaware. Lingo offers VoIP telephone and long-distance voice services to both residential and small business customers. Lingo's registered head office is the same as PTUS.



**B.**     **The Debtors' Business**

12.     The Primus Entities re-sell a wide selection of residential and business telecommunications services (with the exception of wireless phone services).  The revenue generated by Primus Canada accounts for approximately 88% of the Primus Entities' gross revenue.  78% of Primus Canada's revenue is generated in Ontario, with 10% in Quebec, 6% in British Columbia, 4% in Alberta and 2% from other provinces.  The U.S Primus Entities generate the balance of the Primus Entities' gross revenue.

*Primus Canada*

13.     The Canadian telecommunications industry operates under the supervision of the Canadian Radio-television and Telecommunications Commission (the "CRTC"), and is regulated by the *Telecommunications Act*, S.C. 1993, c. 38.  The CRTC regulates matters such as the rates, the terms and conditions under which carriers provide services, the exchange of telecommunications traffic between carriers, and inter-carrier arrangements.

14.     The major carriers (the "Major Carriers") in Canada's telecommunications services industry are BCE Inc. ("Bell"), Rogers Communications Inc. ("Rogers"), Telus Corporation ("Telus"), MTS Inc./Allstream Inc. ("Allstream") and Shaw Communications Inc. ("Shaw" and together with Bell, Rogers, Telus and Allstream, the "Major Carriers").

15.     The Major Carriers are Canada's five largest telecommunications service providers ("TSPs").  Combined, including their affiliates, they accounted for more than 84% of total market revenues in 2014.  The next five largest TSPs accounted for 9% of total market revenues in 2014.  Accordingly, the top 10 TSPs collectively capture 93% of industry revenues; the remaining TSPs capture the balance.

16.     The top 10 TSPs are facilities-based service providers, meaning that they own and operate the majority of the transmission equipment required to provide their telecommunications services.  The vast majority of the remaining TSPs are "re-sellers."[4]

17.     "Re-sellers" are TSPs who acquire (and require) wholesale services from other TSPs to provide telecommunications services to their own customers.  Under a typical re-selling agreement, the wholesaler is responsible for physical service delivery and the re-seller managers the customer relationship.  As a result, the wholesalers own and operate the majority of the necessary infrastructure to provide telecommunications services but the consumers deal exclusively with the re-seller.

18.     The CRTC has mandated that the Major Carriers make certain services available to re-sellers.  The Major Carriers sell these services to Primus Canada (and other re-sellers) at prices determined by the CRTC; all other services offered by Primus Canada are purchased at negotiated rates.

19.     Primus   Canada   offers   a   wide   selection   of   residential   and   business telecommunications services.  Residential services include VoIP, residential internet services, traditional local phone, long distance phone, and pre-paid calling cards.  Business services include H-PBX, local line, long distance, internet and data access services to small-to-medium-sized businesses.  Primus Canada also provides wholesale long distance capacity and ancillary services to smaller telecommunications service providers.  Primus Canada provides its services exclusively through re-selling, as described below.

20.     Primus   Canada   does   not   own   sufficient   telecommunications   network infrastructure to service its customers without purchasing services from a Major Carrier.

---

[4] CRTC Telecommunications Monitoring Report:
http://www.crtc.gc.ca/eng/publications/reports/policymonitoring/2014/cmr5.htm

21.    Primus Canada conducts its business through re-selling other TSPs' (primarily the Major Carrier) services purchased at wholesale rates determined by the CRTC, or through rates negotiated directly with the TSPs (the "Re-Sell Services"). The majority of Primus Canada's gross revenue is earned through the provision of Re-Sell Services.

22.    Certain elements of Primus Canada's services are supplied from 83 "co-locations" which it rents from Bell (74), Telus (5), and Allstream (4). The CRTC obligates the Major Carriers to make space at certain of their facilities available for rent by secondary carriers at a fixed cost (a "co-location arrangement"). Prims Canada maintains hardware at such co-locations and these co-locations allows it to supply local phone, interest and VoIP services for higher margins.

23.    The CRTC regulates what services the Major Carriers must make available to secondary carriers at co-locations. Currently, the services provided by secondary carriers like Primus from co-locations are limited. For example, the higher margin internet offered by Primus Canada through its equipment located in the co-location sites is very restricted in the speeds offered and the geographic range of service covered due to several factors regulated by the CRTC which limit competitive access to the Major Carrier fiber network from the co-location sites to the end customer.

24.    Primus Canada is heavily dependent on the Major Carriers for both the Re-Sell Services business and the co-locations business. Primus Canada's largest Re-Sell Services vendors are Bell, Allstream, Rogers and Telus, accounting for approximately 50% of all supplier obligations to Primus Canada as of November 30, 2015. Bell is Primus Canada's single largest vendor.

25.     Primus Canada is also heavily dependent on its credit card processing service providers, including, without limitation, Chase Paymentech Solutions, Inc. ("Chase"). Approximately 30% of Primus Canada's customers pay for their services via credit card. Customer contract for services by the Primus Entities and arrange to pay for these services going forward by credit card.  The credit card issuer extends credit to the cardholder by debiting the cardholder's credit card account.  Upon being notified of the transaction, Chase pays the applicable Primus Entity and subsequently receives payment from the credit card issuer who deals with payment from the credit card holder.  There is a protocol in place for post-processing rejection and restitution, which is set out in the credit card processing agreement between the parties.  Without Chase, Primus Canada is unable to process any credit card transactions.

26.     Primus Canada has approximately 204,000 residential customers and 23,000 commercial accounts.  In 2015, approximately 56% of Primus Canada's revenue was generated from residential customers, and approximately 44% was generated from commercial customers.

### U.S. Primus Entities

27.     The U.S. Primus Entities account for 12% of the Primus Entities' gross revenue.

28.     The U.S. Primus Entities primarily offer digital home phone service via VoIP technology, which accounts for 39%, and long distance VoIP technology, which accounts for the balance of their revenue.

29.     The U.S. Primus Entities' largest supplier currently is PTGi International Carrier Services, Inc. ("PTGi-ICS").  PTGi-ICS is the wholesale supplier of long-distance phone service for resale by PTI; however, PTGi-ICS recently gave notice to terminate this agreement effective March 31, 2016.

30.     The U.S. Primus Entities have approximately 27,000 residential customers. Approximately 1,100 customers are located in Puerto Rico; the balance of the U.S. Primus Entities' customers are located throughout the United States.

31.     The Federal Communications Commission (the "FCC") regulates telecommunications policies in the United States. Given the small size of the U.S. Primus Entities' business, changes in FCC policy are not expected to materially impact the Primus Entities' overall performance.

32.     The U.S. Primus Entities are fully compliant with the American telecommunications licensing regime.

### Integration between U.S. Primus Entities and Canadian Primus Entities

33.     The Primus Entities' business is intertwined throughout the various Primus Entities' corporations the Primus Entities share networks, platforms, infrastructure and personnel, including senior management.

34.     More particularly, certain functions are completely integrated across all Primus Entities.  The Primus Entities' executive management, located in Canada, is responsible for the strategic direction of the U.S. Primus Entities, and the Primus Entities' Human Resources department, also located in Canada, is responsible for such functions on an entity-wide basis.

### Employees

35.     As of December 9, 2015 the Primus Entities employed approximately 500 people in Canada and 28 in the United States. The Primus Entities' employees by location are summarized below:[5]

---

[5] In addition to the above, there are six employees in Canada and 20 in the United States who have made arrangements to work off-site.

| Location | Primus Entity | Employees |
|----------|---------------|-----------|
| **Canada** | | |
| Toronto | Primus Canada | 242 |
| London | Primus Canada | 3 |
| Vancouver | Primus Canada | 11 |
| Markham | Primus Canada | 12 |
| Ottawa | Primus Canada | 81 |
| Edmundston | Primus Canada | 147 |
| **United States** | | |
| Cedar Rapids, IO | PTI | 4 |
| Tampa, FL | PTI | 4 |

36.    The Primus Entities' workforce is non-unionized.

37.    The Primus Entities do not have a pension plan for their employees.

***Offices and Facilities***

*Canada*

38.    Primus Canada leases its head office in Toronto, Ontario.

39.    Primus Canada has two primary "switch sites"[6] located at 151 Front Street West, Toronto, Ontario, and 555 West Hastings Street, Vancouver, British Columbia.

40.    Primus Canada leases sales and support offices in London, Ontario and Vancouver, British Columbia.

41.    Primus Canada leases an office located in Markham, Ontario.

42.    Primus Canada leases two customer support centres located in Ottawa, Ontario and Edmundston, New Brunswick.

---

[6] Network "hubs" – central facilities from which the Primus Entities' deliver services.

*United States*

43.     PTI leases office space in Cedar Rapids, Iowa.  Four employees work out of that location and support the Primus Entities' Canadian and U.S. operations.

44.     PTI also leases and operates an office in Tampa, Florida.  Four employees work out of that location and their primary role is to provide customer support for the Puerto Rico customer base.

### Cash Management System

45.     In the ordinary course of their business, the Primus Entities use a centralized cash management system to, among other things, collect funds and pay expenses associated with their operations.  The Primus Entities maintain bank accounts in both Canada and the U.S. for their respective Canadian and U.S. operations as well as accounts related to the holding companies.

46.     In the ordinary course of their business, the Primus Entities use a centralized cash management system (the "Cash Management System") to, among other things, collect funds and pay expenses associated with their operations.

47.     As particularized in the Nowlan Affidavit, the Primus Entities maintain bank accounts in both Canada and the U.S. for their Canadian and U.S. operations as well as accounts related to the holding companies.

48.     In the United States, the Primus Entities maintain 11 bank accounts: one account with Banco Popular in Puerto Rico, one bank account with U.S. Bancorp ("US Bank"), and 9 bank accounts with Bank of America ("BOA").

49.     Continued access to the Cash Management System without disruption is critical to the ongoing business of the Applicants.

**C.    Assets**

50.    The Primus Entities prepare financial statements on a consolidated basis. As reflected in the unaudited consolidated financial statements of the Primus Entities for the eleven months' ended November 30, 2015, the assets of the Primus Entities had a net book value of approximately $145 million and consisted of the following:

| | | |
|---|---:|---:|
| Cash and equivalents | 2,896,794 | |
| Accounts receivable | 11,329,605 | |
| Prepaid expenses | 2,280,362 | |
| Inventory, deposits and other receivables | 1,649,540 | |
| **Total Current Assets** | **$18,151,301** | |
| Capital assets | | 26,958,328 |
| Goodwill and other intangibles | | 98,596,009 |
| Restricted cash | | 295,000 |
| Deferred charges | | 1,142,342 |
| | | 126,991,680 |
| **Total Assets** | | **$145,147,981** |

51.    Capital assets include network infrastructure equipment and associated installation costs; software and associated development costs; fiber optic network capacity that the Primus Entities own; capital costs associated with leasehold improvement work; equipment used for voice telecommunications services; infrastructure equipment for the US network; equipment provided to customers for rent; computers; office equipment and phone systems; and automobiles.

52.    The "Goodwill and other intangibles" line item represents intangible assets and consists of goodwill, brand and customer list intangibles at 43%, 21% and 36%, respectively.

53.    The principal debt obligations of the Primus Entities are described in more detail below.

**D.**     **Current Liabilities**

54.     As of November 30, 2015, the Primus Entities had liabilities on a consolidated basis totalling $100,972,326.  The principal debt obligations of the Primus Entities are described in more detail below.

55.     In addition to the principal debt obligations as at November 30, 2015, the Primus Entities had approximately $30,386,172 of other current liabilities, including:

| | |
|---|---:|
| Accounts payable | 7,887,868 |
| Accrued liabilities | 7,483,255 |
| Income taxes payable | (23,336) |
| Deferred revenue | 6,097,555 |
| Other current liabilities | 8,940,829 |
| **Total Current Liabilities**[7] | **$30,386,172** |

*Credit Agreement*

56.     Primus Canada is indebted to the Bank of Montreal ("BMO"), HSBC Bank Canada ("HSBC") and ATB Corporate Financial Services ("ATB", and together with BMO and HSBC, the "Syndicate"),  in the amount of $40,700,000 pursuant to a Credit Agreement dated July 31, 2013, such credit agreement as amended by an amending agreement (the "Amending Agreement") dated September 23, 2014 (the "Credit Agreement").   The Credit Agreement matures on July 31, 2017.

57.     The Credit Agreement is comprised of two main credit facilities (the "Facilities"). Facility A is a secured revolving credit facility under which Primus Canada can draw up to $10,000,000 for general working capital purposes, subject to a borrowing base calculation.

---

[7] Excluding secured debt.

Facility B is a secured non-revolving credit facility under which the Syndicate made one advance to Primus Canada in the amount of $60,000,000. The Primus Entities also have a "swingline" facility under the Credit Agreement pursuant to which they have drawn a letter of credit in the approximate amount of $295,000 in relation to their tenancy at the customer support centre in Ottawa, Ontario.

58.     Under the Credit Agreement, Primus Canada has granted comprehensive first-ranking security to BMO as administrative agent of the Syndicate over all of its assets pursuant to, among other things, a general security agreement.

59.     Primus Canada's obligations under the Credit Agreement are guaranteed by all of the Primus Entities. Such guarantees are also secured by substantially all of the assets of the Primus Entities pursuant to, among other things, general security agreements and a deed of hypothec, with (a) *Personal Property Security Act* ("PPSA") filing statements registered in the following jurisdiction: Holdco (Ontario); Primus Canada (British Columbia, Alberta, Saskatchewan, Manitoba, Ontario, New Brunswick and Quebec); and Lingo (Ontario); and (b) UCC registrations in the following jurisdictions: Primus Canada (District of Columbia); PTUS (Delaware); and Lingo (Delaware).

60.     Counsel to the Monitor is in the process of completing a review of the security granted to the Syndicate and expects to be in a position to deliver an opinion on the validity and enforceability of such security shortly. The Monitor will report on such security opinion in due course.

61.     In the event of a default under the Credit Agreement, any credit issued under the Facilities becomes due and payable upon written notice to Primus Canada.

62.    Primus Canada is also a counterparty to three swap agreements (together, the "Swap Agreements") with the Syndicate lenders HSBC, ATB and BMO (each being a "Swap Bank" and together, the "Swap Banks") in the approximate amount of $20,250,000. While each agreement is distinct, the terms of each are virtually identical. Under the Swap Agreements, Primus Canada has agreed to pay each Swap Bank a fixed rate of interest (1.97%) on a notional principal amount (which declines over time) on specific dates. Concurrently, each Swap Bank has agreed to make payments based on a floating interest rate to Primus Canada on that same notional principal on the same specified dates for the same specified time period.  The Primus Entities' obligations under the Swap Agreements are secured by the general security agreement.

63.    If terminated on January 14, 2016 under the Swap Agreement, the Swap Banks would be entitled to a payment in the approximate amount of $375,000 from Primus.  The Swap Agreements expire on July 31, 2017.

### Subordinate Credit Agreement

64.    Primus Canada is also indebted to the Manufacturers Life Insurance Company ("Manulife") and BMO Capital Partners ("BMOCP" and together with Manulife, the "Subordinate Lenders"), in the principal amount of $20,000,000 (the "Subordinate Debt") pursuant to a subordinate credit agreement (such credit agreement, as amended, the "Subordinate Credit Agreement") dated July 31, 2013, as amended by an amending agreement dated September 23, 2014.  The Subordinate Credit Agreement matures on July 31, 2018.  As of November 30, 2015, Primus Canada is indebted to the Subordinate Lenders in the amount of $22,971,359.94, inclusive of accrued interest.

65.    Under the Subordinate Credit Agreement, Manulife and BMOCP each established a credit facility for Primus Canada in the maximum principal amounts of $14,600,000 and

$5,400,000, respectively. Such funds were made available to Primus Canada by way of a single advance.

66.    Under the Subordinate Credit Agreement, Primus Canada has granted a security interest to Manulife as collateral agent of the Subordinate Lenders over all of its assets pursuant to, among other things, a general security agreement, which security interest ranks behind the security granted to the Syndicate pursuant to the terms of the "Intercreditor Agreement" (defined below).

67.    Primus Canada's obligations under the Subordinate Credit Agreement are guaranteed by all of the Primus Entities. Such guarantees are also secured by substantially all of the assets of the Primus Entities pursuant to, among other things, general security agreements and a deed of hypothec. In an event of default, any credit issued under the Subordinate Credit Agreement becomes due and payable upon written notice to Primus Canada.

E.    **Financial Difficulties**

68.    The Primus Entities have been experiencing and continue to experience severe strains on their cash flow as a result of, among other things, declining revenues, the Primus Entities' customer base transitioning to lower profit margin services and over-leverage. The Primus Entities' significant fixed costs have hindered their ability to quickly and adequately respond to such revenue declines.

69.    As a result, the Primus Entities' earnings before interest, taxes, depreciation and amortization ("EBITDA") and net operating profit have deteriorated over the last three years, and continue to deteriorate. While EBITDA was stabilized over the last seven months due to cost management and reduced marketing activities, this level of EBITDA is insufficient to meet the obligations under the secured credit agreements.

*Revenue*

70.     Since 2012, the Primus Entities' revenue has declined an average of 9% per year. The Primus Entities' Canadian residential business, representing approximately 56% of their gross revenue for 2015, has declined an average of 9% year-over-year ("YOY") since 2012.

71.     Changing technology and, as a result, consumer behaviour is the primary driver behind the residential sector revenue decline. Advances in network and wireless technology have decreased demand for long-distance and local phone, and pre-paid calling cards (the "Legacy Services"). In addition, rapid growth in the sale of bundled TV, internet, and voice services by the Major Carriers have exerted considerable price pressures on the markets that the Primus Entities compete in.

72.     Consumer preferences are shifting towards mobile technology and high-speed internet. The Primus Entities do not have the capability to provide mobile services. The Primus Entities' internet services offered through their co-location sites are primarily limited to lower-speed offerings. As such, the Primus Entities' internet service customers have been rapidly transitioning from higher margin co-location services to materially lower margin re-sell services.

73.     The Primus Entities' residential service offering primarily involves the provision of Legacy Services, with high-speed internet services representing a growth offering.  In the past, Legacy Services were the Primus Entities' largest revenue generator.  Since 2012, however, the Primus Entities' revenue from Legacy Services in Canada has declined 18% YOY and 35% YOY in the United States.

74.     Moreover, in 2013, Bell accelerated the promotion of its bundled high-speed internet, TV, and voice service offerings (the "Triple Play" bundle) leading to considerable pricing pressures on the market for such services. The Primus Entities do not offer TV services,

and thus cannot create a bundle offering to compete against the bundled offerings of the Major Carriers.

75.     The attraction of new customers in 2014 and Q1 2015 has also contributed to the Primus Entities' profitability decline. Each new customer represents additional marketing, hardware and installation costs, as well as staffing costs related to the on-boarding of those customers.

76.     It can take up to one year before the costs associated with a new customer are recovered. Therefore, adding new customers to offset the rapidly declining Legacy Services revenues requires significant capital. Due to limits imposed by its capital structure, a lack of new capital availability, and the decline of high profit margin Legacy Services and co-location services revenues, the Primus Entities have had to constrain their customer growth initiatives.

77.     As a result of the decline in demand for Legacy Services, the Primus Entities' inability to offer mobile services and their inability to compete with Bell's Triple Play bundle (or similar bundles offered by the other Major Carriers), the Primus Entities' gross revenue decreased from $229,024,000 in the fiscal year ended 2012 ("FY2012") to $198,511,000 in the fiscal year ended 2013 ("FY2013") and to $180,078,000 in the fiscal year ended 2014 ("FY2014") and is forecasted to decline to $165,859,252 in the fiscal year ended 2015 ("FY2015").

*Expenditures*

78.     The Primus Entities have high fixed overhead costs, which cannot be materially reduced as they relate to functions that are necessary to run the Primus Entities' business. Such costs stem from supporting a national telecommunications infrastructure with the related

engineering and support requirements. Moreover, as the Primus Entities' customer base has been steadily declining, any reductions in overhead costs are outweighed by declining revenue.

79.    In order to maintain and grow their service offerings, the Primus Entities incur capital expenditures ("Capex") every year. Such Capex include (i) hardware related to the sales of H-PBX and VoIP; (ii) network and client premises equipment expenditures required to support new customers; (iii) maintenance and replacement of components in network infrastructure; (iv) investment in network and internet delivery infrastructure; (v) capitalized employee and consulting costs associated with network projects; and (vi) maintenance and improvements to the Primus Entities' information systems, software, servers and storage capacity.

80.    Over the past four years, the Primus Entities' annual average Capex was $7,898,993 per year.

81.    The Primus Entities are also carrying significant debt service obligations in respect of their secured debt facilities

82.    In 2015, the Primus Entities' debt service obligations and capital expenditures totalled approximately $18,365,182[8] compared to $9,871,722 in EBITDA.

### EBITDA

83.    As a result of the declining Legacy Services revenues, the margin pressures exerted by the Primus Entities' changing revenue mix, and the high up-front costs associated with adding new customers, the Primus Entities' EBITDA declined from $41,442,000 in FY2012 to $36,073,000 in FY2013 and $22,499,000 in FY2014, and $9,871,722 forecasted in FY2015.

---

[8] Debt service obligations ($12,295,438); capital expenditures ($6,069,744).

84.    This annual downward trend has continued in the current fiscal year as a high volume of new customers were added in the fourth fiscal quarter of 2014 and the first fiscal quarter of 2015.  For the first quarter of 2015, EBITDA has declined 89% over the same period in the prior year, from $7,123,000 to $753,000.    Monthly EBITDA has stabilized at approximately $1 million per month for the last nine months of 2015. The stabilized EBITDA is due to the reduction in marketing initiatives resulting in lower volume of new customer sign-ups and overall cost reduction initiatives.

### Net Income/Loss

85.    The Primus Entities reported a net loss of $830,000 in FY 2014, and forecast a net loss of $13,078,000 for FY 2015.

86.    A copy of the Primus Entities' consolidated unaudited financial statements for the eleven months ending November 30, 2015 is attached to the Nowlan Affidavit as Exhibit B.

87.    A copy of the Primus Entities' consolidated financial statements prepared on a 13-month rolling basis and current to November 30, 2015, is attached to the Nowlan Affidavit as Exhibit C.

88.    The Primus Entities have not finalized their FY 2015 audited financial statements.

### Defaults Under the Credit Agreements

*Credit Agreement*

89.    Under the Credit Agreement, Primus Canada is required to, among other things, maintain certain debt to EBITDA ratios.  Under Facility B specifically, Primus Canada is required to, among other things, make quarterly principal repayments in the amount of $2,250,000 on the last business day of each calendar quarter.  Failure to meet these covenants constitutes an event of default.

90.     As of late 2014, the Primus Entities have been unable to maintain certain debt to EBITDA ratios specified under the Credit Agreement (the "Credit Agreement Defaults"), and were therefore in default under the Credit Agreement.

91.     The Credit Agreement Defaults have placed the Syndicate in a position to declare a "Standstill Period" pursuant to the Intercreditor Agreement. During a Standstill Period, Primus Canada would be prohibited from making any payments due under the Subordinate Credit Agreement, other than reasonable expenses due not in excess of $100,000.

92.     Primus Canada entered into a forbearance agreement with the Syndicate on February 4, 2015 (the "Syndicate Forbearance Agreement"). Under the Syndicate Forbearance Agreement, Primus Canada acknowledged the Credit Agreement Defaults and agreed to provide a revised business plan for fiscal year 2015 and specified financial information.   A copy of the Syndicate Forbearance Agreement is attached as Exhibit D to the Nowlan Affidavit.

93.     The Syndicate Forbearance Agreement expired on February 27, 2015.

94.     On February 27, 2015, the Syndicate gave notice to Primus Canada that (i) the Syndicate reserved its rights to take the steps it believes are required to, among other things, realize on its security; (ii) the Syndicate was exercising its right to charge an additional 2% per annum interest on all amounts outstanding under the Credit Agreement; and (iii) Duff & Phelps Canada Restructuring Inc. was to be appointed pursuant to the Credit Agreement as a consultant to review and report the viability of the Primus Entities' business and strategy going forward on behalf of the Syndicate.

95.     As described in detail below, on August 31, 2015, following extensive and careful arms-length negotiation commencing in July 2015, Primus Canada entered into a support

agreement with the Syndicate lenders (the "Support Agreement") further to which the Syndicate agreed to support a sale and investor solicitation process (a "SISP") on a going concern basis.

*Subordinate Credit Agreement*

96.     Primus Canada has also defaulted under the Subordinate Credit Agreement, (the "Subordinate Credit Agreement Defaults"). Specifically, Primus Canada has not serviced its Subordinate Debt since January 31, 2015, which constitutes default under section 901(b) of the Subordinate Credit Agreement and a cross-default under section 9.01(f) of the Credit Agreement. Primus Canada also did not maintain certain debt to EBITDA rations specified under section 6.02 of the Subordinate Credit Agreement (together with section 9.01 defaults, the "Subordinate Credit Agreement Defaults").

97.     Primus Canada entered into a forbearance agreement with the Subordinate Lenders on February 4, 2015 (the "Subdebt Forbearance Agreement"). Under the Subdebt Forbearance Agreement, Primus Canada acknowledged the Subordinate Credit Agreement Defaults and agreed to provide a revised business plan for fiscal year 2015 and specified financial information. Primus Canada further agreed that as a consequence of the Subordinate Credit Agreement Defaults, the Subordinate Lenders were entitled to charge an additional 2% interest in accordance with section 9.02 of the Subordinate Credit Agreement, upon written notice of same. A copy of the Subdebt Forbearance Agreement is attached as Exhibit E to the Nowlan Affidavit.

98.     The Subdebt Forbearance Agreement expired on March 2, 2015. On March 9, 2015, the Subordinate Lenders gave notice to Primus Canada that (i) due to the Subordinate Credit Agreement Defaults, interest on all amounts outstanding under the Subordinate Credit Agreement were accruing interest at a rate of 15% per annum, as of January 31, 2015, in

accordance with section 3.06 of the Subordinate Credit Agreement; and that (ii) the Subordinate Lenders have reserved their rights to take the steps they believe are required to, among other things, realize on their security.

### *Support Agreement and the SISP*

99.    As mentioned above, on August 31, 2015, following extensive and careful arms-length negotiations, Primus Canada entered into a support agreement with the Syndicate Lenders (the "Support Agreement") further to which the Primus Entities agreed to conduct and the Syndicate agreed to support a sale and investor solicitation process (a "SISP") on a going concern basis.    A copy of the Support Agreement is attached as Exhibit F to the Nowlan Affidavit.

*The Support Agreement*

100.    The Primus Entities elected to pursue the SISP outside of CCAA proceedings out of concern that, among other things, a prolonged period under CCAA protection necessary to implement a post-CCAA filing sales process would have a serious and detrimental impact on the Primus Entities' business and its customers which could diminish the value of the business as a whole.    The bargain reflected in the Support Agreement was a product of a meticulous balancing of interests of Primus Entities' various stakeholders, the result of which was to allow the Primus Entities to implement their proposed restructuring strategy (i.e., the SISP) as a going concern while preserving the position of the Syndicate Lenders and the Primus Entities' other stakeholders if the SISP did not, ultimately, result in any restructuring transaction(s).

101.    Under the Support Agreement, the Syndicate lenders agreed among other things, to:

(a)    a standard forbearance in exercising their rights and remedies as creditors;

(b)    a series of particular covenants to support the implementation and execution of the SISP, including not to take any action inconsistent with the Support Agreement or that would frustrate the consummation of any SISP transaction(s);

(c)    support the approval of any SISP transaction(s) as promptly as practicable if the transaction is acceptable to the Syndicate lenders and BMO, in its capacity as administrative agent to the Syndicate, acting reasonably; and

(d)    not to propose, vote for or otherwise support alternative arrangements under the CCAA, the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 or otherwise (thereby circumventing the SISP at a sensitive time).

102.    In exchange, Primus Canada agreed, among other things:

(a)    to certain reporting and monitoring requirements, particularly with regard to the progress of the SISP;

(b)    not to materially increase compensation, severance or other benefits payable to their employees except in accordance with the terms of the key employee retention plan ("<u>KERP</u>") in the form attached to the Support Agreement[9];

(c)    to adhere to an ongoing business plan, with reference to a particular cash flow projection and with detailed reporting obligations; and

(d)    to implement the SISP for the purpose of identifying one or more purchasers of and/or investors in the Primus Entities' business with a targeted completion date for a transaction of December 31, 2015.

103.    All material decisions with respect to the SISP (including whether to enter into a transaction and which one to enter into) remained exclusively within the sole discretion of the boards of the Primus Entities (and concomitantly their current management) to be made in accordance with their fiduciary duties with respect to securing the best available strategic alternatives for the Primus Entities.

***The SISP Deadlines***

---

[9] The Primus Entities have entered into KERPs with 8 people, each of whom are critical to the strategic, day-to-day operations and management of the Primus Entities and/or the smooth execution and implementation of the SISP. The KERPs provide for future potential payments to the KERP participants in the maximum aggregate amount of $500,000.

104.    The timeline for implementing the SISP was set out in section 5 of the Support Agreement (each step being designated a "Milestone", the execution of which was an essential precondition to the continuance of the Support Agreement).  Pursuant to the Support Agreement, Primus Canada covenanted to:

(a)    Commence marketing to prospective financiers, investors and/or purchasers (together, with others expressing a similar interest, the potential "Interested Parties") on or before September 1, 2015;

(b)    Be in receipt of one or more Phase I Bids (which is defined as an original executed copy of a comprehensive non-binding letter of intent) on or before October 1, 2015;

(c)    Be in receipt of one or more Phase II Bides (which is defined as a comprehensive final and binding proposal) on or before November 2, 2015;

(d)    Enter into a binding agreement(s) with the "Successful Bidder(s)" (a bidder whose Phase I Bid was, ultimately, accepted and with whom the Primus Entities seeks to consummate a transaction) on or before November 30, 2015; and

(e)    Close all agreements and transactions with the Successful Bidder(s) On or before December 31, 2015.

105.    The failure to meet any of the Milestones set out above was a "Triggering Event" within the meaning of section 8 of the Support Agreement, which entitled any Syndicate lender to terminate the Support Agreement.  As a result, continued and ongoing adherence to the Milestones was a necessary precondition for successfully implementing the SISP (and thereby facilitating a successful restructuring).

106.    However, it was also understood that the Milestones and procedures could be amended at any time by mutual agreement should there be sufficient rationale that such amendments would be to the mutual benefit of the parties to the Support Agreement and other stakeholders of the Primus Entities.

107.    On October 30, 2015, Primus Canada and the Syndicate lenders entered into an agreement (the "First Amending Agreement") extending the SISP timeline originally provided for in the Support Agreement to allow Primus Canada to be in receipt of one or more Phase II Bids on or before November 16, 2015 and to enter into a binding agreement(s) with the Successful Bidder(s) on or before December 14, 2015.    The First Amending Agreement is attached as Exhibit G to the Nowlan Affidavit.

108.    The SISP Milestones in the Support Agreement were extended in accordance with its terms, in part, to provide potential SISP bidders with further time to complete all required due diligence and otherwise ensure their bids could be turned into executable transactions in compliance with the SISP.

109.    The SISP timeless was further extended pursuant to a second agreement (the "Second Amending Agreement") which allowed the Primus Entities: (i) to be in receipt of one or more Phase II bids on or before December 23, 2015; (ii) enter into a binding agreement with the Successful Bidder(s) on or before January 19, 2015; and (iii) close all agreement and transactions on or before February 29, 2016.

### *The SISP*

110.    Further to the timeline and conditions set out in the Support Agreement (and as will be described in greater detail in the Primus Entities' materials to be filed in support of a motion (the "Sale Approval Motion") to approve, *inter alia*, a sale of the Primus Entities' assets (if this Court grants the Initial Order sought herein)), the Primus Entities commenced the SISP in September 2015.

111.    Following a competitive selection process, Origin Merchant Partners ("Origin") was engaged by Primus Canada to act as a financial advisor pursuant to an engagement letter

dated August 7, 2015 (the "Engagement Letter"), and commenced solicitation of potentially interested parties.

112.    As a result of the efforts of the Primus Entities, Origin and other advisors, six interested parties emerged and submitted Phase I Bids.    Three parties ultimately submitted comprehensive, final and binding offers.

113.    A period of extensive and intensive arm's length negotiations followed the offers, each of which were each evaluated in accordance with the criteria enumerated in the SISP. Ultimately, the bid by Birch Communications Inc. ("Birch Communications") was determined to be the Successful Bid.

114.    An essential precondition to the contemplated Asset Purchase Agreement (the "APA") between the Primus Entities and Birch Communications (in this capacity, the "Purchaser") was the expeditious application to the Canadian Court for the Initial Order.

115.    In advance of filing for CCAA protection, and in order to comply with the provisions of the Support Agreement detailed above, the parties entered into two preliminary agreements:

    (a)    First, on December 18, 2015, the Primus Entities entered into an Escrow Agreement with the Purchaser and FTI (as escrow agent), whereby $2,000,000 would be deposited into an escrow account in contemplation of entering into the aforementioned APA to be released as part of the closing thereof; and

    (b)    Second, on December 22, 2015, the Primus Entities entered into an exclusivity letter agreement with the Purchaser whereby the Primus Entities agreed to terminate any existing discussions with any third party, and not to solicit, encourage or otherwise commence or continue discussions with, or provide any information to, any third party, regarding the sale to any such third party of all or any of the Purchased Assets (as defined in the APA) or any investment or other participation by any such third party in any of the business, enterprise, securities, assets or properties of any of the Primus Entities. The exclusivity letter agreement was a

condition precedent to the Purchaser pursuing the sale transaction contemplated in the APA.

116.    After extensive deliberations and consultations with their professional advisors, the Primus Entities concluded, further to and on the basis of their commercial and business judgement, that the transaction contemplated in the APA represented the best offer available to them in the circumstances and that proceeding with such transactions was in the best interest of the stakeholders.

### *The Sale Transaction*

117.    The Primus Entities and the Purchaser executed and delivered a definitive version of the APA dated January 18, 2016, subject to Court approval.  Further details and a copy of the APA will be served and filed with the Primus Entities' motion materials to approve same.

118.    The essential terms of the definitive version of the APA and the Sale Transaction contemplated therein are as follows:

(a)    The Purchaser will acquire substantially all of the business, assets and operations of the Primus Entities, including principally all of their patents, patent applications, trademarks and domains ("Purchased Assets" and "Purchased Intellectual Property" respectively, and as set out in Schedule "A" and "H" to the APA) but excluding any shares and other securities owned by any Primus Entity ("Excluded Assets", set out in Schedule "D" to the APA) on an "as is, where as" basis as existing at "Closing Time" (as defined in the APA and subject to representation and warranties therein);

(b)    The aggregate purchase price ("Purchase Price") payable to the Primus Entities is calculated on the basis of the Purchase Price formula set out further to sections 3.1 and 3.7 of the APA, consisting of the following:

      i.    The "Base Purchase Price" of $44 million (as the term is defined in the APA and as adjusted in accordance with the formula set out therein);

      ii.    Less certain Cure Costs (as defined in the APA); and

      iii.    Less certain other amounts payable that do not constitute Cure Costs in respect of "Essential Contracts" (as defined in the APA).

(c)     The Purchaser may, in its sole discretion, offer employment to any or all active and inactive Primus Entity employees (collectively "Transferred Employees") conditional on "Closing" (as each is defined in the APA);

(d)     The Purchaser will assume, perform, discharge and pay the obligations of the Primus Entities ("Assumed Obligations") set out in section 2.5 of the APA, including, but not limited to, the following:

i. all debts, liabilities and obligations under an "Assumed Contract" assigned or transferred to the Purchaser on Closing for the period from and after Closing Time, provided that such debts, obligations or liabilities do not arise from or are due or attributable to:

(A)     any default existing or breach by any Primus Entity occurring prior to or as a consequence of Closing, or

(B)     any default, breach or violation of any Primus Entities' of any term or condition of the APA;

(ii)     all debts, liabilities and obligations for which the Purchaser is responsible in respect of Transferred Employees as per the APA.

119.    The Purchaser may terminate the APA, in its sole and absolute discretion, if this Court orders a post-filing sales process or it may elect not to terminate the APA and have it serve as a stalking horse offer in such post-filing sales process with customary stalking horse protections, in accordance with the terms of the exclusivity letter arrangement (which are to include, without limitation, a 3% break-free to be paid from the proceeds of any overbid in favor of the Purchaser), subject to Court approval.

120.    Subject to obtaining the Initial Order being sought in the Canadian Proceeding, the Primus Entities intend to return to the Canadian Court to seek approval of the APA and various ancillary relief, including, if necessary, the assignment of certain agreements to the extent that necessary consents to such assignments are not obtained prior to the date of the Motion.

**F.     The Canadian Proceeding**

30

121.    Defaults under the Credit Agreement and the Subordinate Credit Agreement allow the Syndicate or Subordinate Lenders, respectively, to exercise certain remedies, including acceleration of payment of all amounts due under their agreement. Primus Canada does not have sufficient liquidity to satisfy the accelerated payment obligations arising from an event of default under either agreement.

122.    The Syndicate Lenders require the Primus Entities to proceed expeditiously with obtaining approval and implement the APA and have indicated that they will not extend the forbearance under the Support Agreement otherwise.

123.    Without forbearance, the Primus Entities cannot meet their liabilities as they come due and do not have sufficient cash to service their debt obligations.  As such, the Primus Entities are insolvent.  Therefore, the Primus Entities required CCAA protection to implement sales of their assets for the benefit of their stakeholders.

124.    On January 18, 2016, the boards of the Debtors authorized the CCAA filing.

125.    On January 19, 2016, an Order was entered in the Canadian Proceeding appointing FTI as Monitor and authorized Foreign Representative for the Debtors.  As indicated above, a certified copy of the Order appointing the Foreign Representative (the "Initial Order") is attached hereto as **Exhibit A**.

126.    The Initial Order specifically contemplates the institution of these chapter 15 proceedings by the Foreign Representative.

127.    At this time, however, the Foreign Representative is only seeking recognition of the Initial Order under chapter 15 of the Bankruptcy Code.

128.    Subject to obtaining the recognition being sought herein, the Debtors intend to return to the Canadian Court to seek approval of the APA and vesting of all of the Purchased

Assets in the Purchaser (as defined in the APA), free and clear, (the "Canadian Approval & Vesting Order") and various ancillary relief, including, if necessary, the assignment of certain agreement so that necessary consents to such assignments are not obtained prior to the date of the motion.

129.    Subject to obtaining the Canadian Approval & Vesting Order in accordance with the requirements of Canadian Law, the Debtors intend to return to this Court to seek recognition of the Canadian Approval & Vesting Order in accordance with the requirements of chapter 15 of the Bankruptcy Code.

## RELIEF REQUESTED

130.    In its capacity as foreign representative of the Debtors, the Monitor seeks an Order of this Court pursuant to sections 105(a), 1507, 1517, 1520, and 1521 of the Bankruptcy Code, substantially in the form of the proposed order attached hereto as **Exhibit C**, granting the following relief:

  a.    Recognition of the Canadian Proceeding as a foreign main proceeding as defined in section 1502(4) of the Bankruptcy Code;

  b.    Recognition of the Monitor as a foreign representative;

  c.    Granting relief as of right upon recognition of a foreign main proceeding pursuant to section 1520 of the Bankruptcy Code, including but not limited to the "automatic stay" under Bankruptcy Code section 362, or if not as of right, then as additional relief authorized by section 1521 of the Bankruptcy Code;

  d.    Granting further additional relief as authorized by section 1521 of the Bankruptcy Code, including, without limitation:

      i.    Authorizing the application of sections 363 and 365 of the Bankruptcy Code to these proceedings.

  e.    Otherwise granting comity to and giving full force and effect to the Canadian Proceeding; and

      f.      Awarding the Monitor such other and further relief as this Court may deem just and proper.

131.    In the event the Court determines that the Canadian Proceeding is not eligible to be recognized as a foreign main proceeding as to any of the Debtors, the Monitor seeks recognition of the Canadian Proceeding as a foreign non-main proceeding as defined in section 1502(5) of the Bankruptcy Code as to those entities, and requests that the Court grant the relief requested above, and such other and further relief as is proper, pursuant to section 1521 of the Bankruptcy Code.

## BASIS FOR RECOGNITION AND RELIEF REQUESTED

**A.**    **The Court has Jurisdiction to Recognize the Canadian Proceeding and Grant the Relief Requested**

132.    This Court has jurisdiction to hear and determine cases commencing under the Bankruptcy Code and all core proceedings arising thereunder pursuant to 28 U.S.C. §§ 157 and 1334 and section 1501 of the Bankruptcy Code, as well as the Order of Reference. A case under chapter 15 is a "case" under the Bankruptcy Code. Recognition of foreign proceedings and other matters under chapter 15 of the Bankruptcy Code have been expressly designated as core proceedings pursuant to 28 U.S.C. § 157(b)(2)(P). Venue is proper in this district pursuant to 28 U.S.C. § 1410.

**B.**    **These Cases are Proper Under Chapter 15**

133.    Chapter 15 of the Bankruptcy Code applies where a foreign representative seeks the assistance of a United States bankruptcy court in connection with a foreign proceeding. *See* 11 U.S.C. § 1501(b)(1). The Debtors' cases are proper under chapter 15 because (a) these cases concern a "foreign proceeding," (b) these cases were commenced by the Monitor, a duly authorized "foreign representative" of the Debtors, (c) the Petitions for Recognition, and all

required supporting documentation, were properly filed, and (d) the relief sought by the Petitions

for Recognition is consistent with the objectives of chapter 15.

134.  *The Canadian Proceeding is a "Foreign Proceeding."*  Section 101(23) of the

Bankruptcy Code defines a "foreign proceeding" as:

> a collective judicial or administrative proceeding in a foreign country, including
> an interim proceeding, under a law relating to insolvency or adjustment of debt in
> which proceeding the assets and affairs of the debtor are subject to control or
> supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).  The Canadian Proceeding fits squarely within the Bankruptcy Code's

definition of a "foreign proceeding," as it is an action brought under the CCAA.  As set forth

more fully in the Meakin Declaration, the CCAA Proceeding is a judicial proceeding brought

under the CCAA that is supervised by the Canadian Court.  The CCAA provides for a controlled

reorganization procedure designed to enable financially distressed companies to avoid

foreclosure or seizure of assets while maximizing the company's value as a going concern for the

benefit of creditors and other parties in interest.

135.  As detailed in the Meakin Declaration, although the Debtors' management and

board of directors remain in place, and the board maintains its power under Canadian law to

approve significant actions, including disposing of important assets, borrowing significant

amounts, or changing corporate structures, such actions are subject to Canadian Court approval,

and the Debtors' assets and affairs are subject to the supervision of the Canadian Court during

the pendency of a CCAA Proceeding.  In addition, the Canadian Court appoints a monitor who

functions as an independent officer of the Canadian Court and (i) monitors the Debtors' ongoing

operations, (ii) reports to the Canadian Court on any major events affecting the Debtors, (iii)

assists with preparing, filing, and holding meetings for voting on any plan of compromise or

arrangement, and (iv) prepares a report on the plan of compromise or arrangement, if filed.   The

Canadian Court, through the CCAA Proceeding, is properly exercising its jurisdiction over the Debtors.

136.    In connection with the CCAA Proceeding, on January 19, 2016, the Canadian Court entered the Initial Order. The Initial Order provides for certain relief, including, among other things,  (i) a stay of all proceedings and actions against the Debtors, (ii) a charge on the Debtors' assets to secure payment in favor of indemnities granted to the Debtors' directors and officers), (iii) an order prohibiting all of the Debtors' suppliers from interfering with the supply of goods or services to the Debtors, and (iv) an administration charge on the Debtors' assets to secure fees and disbursements incurred in connection with professional services rendered to the Debtors, including the Monitor's fees and legal fees of the Monitor.

137.    Courts have consistently recognized that a Canadian restructuring proceeding under the CCAA constitutes a "foreign proceeding," as defined in the Bankruptcy Code. *See, e.g., In re Thane International, Inc., et al.,* No. 15-12186 (KG)(Bankr. D. Del. December 1, 2015 [D.I. 41]; *In re Essar Algomar,* No. 15-12271 (BLS)(Bankr. D. Del. December 1, 2015) [D.I. 97]; *In re Lone Pine Res. Inc.,* No. 13-12487 (BLS) (Bankr. D. Del. Sept. 26, 2013 [D.I. 18]; *In re Xentel Inc.,* No. 13-10888 (KG) (Bankr. D. Del. Apr. 12, 2013) [D.I. 15]; *In re Cinram Int'l Inc.,* No. 12-11882 (KJC) (Bankr. D. Del. June 26, 2012 [D.I. 30]; *In re Arctic Glacier Int'l Inc.,* No. 12-10605 (KG) (Bankr. D. Del. Mar. 16, 2012) [D.I. 28]; *In re Angiotech Pharm., Inc.,* No. 11-10269 (KG) (Bankr. D. Del. Feb. 22, 2011) [D.I. 26]; *In re Grant Forest Prod. Inc.,* No. 10-11132 (PJW) (Bankr. D. Del. Apr. 26, 2010) [D.I. 47]; *In re Fraser Papers,* No. 09-12123 (KJC) (Bankr. D. Del. July 13, 2009) [D.I. 30]; *In re W.C. Wood Corp., Ltd.,* No. 09-11893 (KG) (Bankr. D. Del. June 18, 2009) [D.I.26]; *In re Nortel Networks Corp.,* No. 09-10164 (KG)

(Bankr. D. Del. Feb. 27, 2009) [D.I. 40]; *In re MAAX Corp.*, No. 08-11443 (CSS)(Bankr. D. Del.

Aug. 5, 2008) [D.I. 22].

138.   *The Monitor is a Proper "Foreign Representative."*   Section 101(24) of the

Bankruptcy Code provides that:

> The term "foreign representative" means a person or body, including a person or
> body appointed on an interim basis, authorized in a foreign proceeding to
> administer the reorganization or the liquidation of the debtor's assets or affairs or
> to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).   The Monitor is a "person" within the meaning of section 101(41) of the

Bankruptcy Code, to assist the Debtors and the Canadian Court, and fulfill its duties in the

Canadian Proceeding.   Moreover, pursuant to the Initial Order, the Canadian Court named the

Monitor the foreign representative for the Debtors, and authorized and empowered the Monitor

as a foreign representative for purposes of filing chapter 15 petitions in the United States.   At

Paragraph 38 of the Initial Order, the Canadian Court ordered:

> …[T]hat the Monitor is hereby authorized and empowered, but not
> required, to act as the foreign representative in respect of the
> within proceedings for the purpose of having these proceedings
> recognized in a jurisdiction outside of Canada including, if deemed
> advisable by the Monitor, to apply for recognition of these
> proceedings in the United States pursuant to Chapter 15 of Title 11
> of the United States Code…and to take such other steps as may be
> authorized by the Court and any ancillary relief in respect thereto.

139.   Accordingly, the Monitor is a "foreign representative" as authorized by the

Canadian Court and as defined in the Bankruptcy Code.

140.   *The Foreign Representative Properly Filed these Cases.*   These cases were duly

and properly commenced as required by sections 1504 and 1509(a) of the Bankruptcy Code by

the filing of the Petitions for Recognition pursuant to section 1515(a) of the Bankruptcy Code,

which was accompanied by all documents and information required by sections 1515(b) and (c).

*See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 127 (Bankr. S.D.N.Y. 2007) ("A case under chapter 15 is commenced by a foreign representative filing a petition for recognition of a foreign proceeding pursuant to section 1515 of the Bankruptcy Code"), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008).   Because the Foreign Representative has satisfied the requirements set forth in section 1515 of the Bankruptcy Code, these cases have been properly commenced.

141.    *The Petitions for Recognition are Consistent with the Purpose of Chapter 15.* One of the stated objectives of chapter 15 is the "fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor." 11 U.S.C. § 1501(a)(3).   These cases have been commenced for the purpose of obtaining the assistance of the Court to ensure the effective and economical administration of the Canadian Proceeding by, among other things, restricting the Debtors' creditors from taking certain actions in the United States that would undermine the unified, collective, and equitable resolution of the Debtors' liabilities in the Canadian Proceeding before the Canadian Court.   As such, the Petitions for Recognition are consistent with the purpose of chapter 15 and the cross-border coordination it promotes.

C.    **The Canadian Proceeding is a "Foreign Main Proceeding" Under Sections 1502(4) and 1517(b)(1) of the Bankruptcy Code**

142.    The Monitor respectfully submits that the Court should grant recognition of the Canadian Proceeding as a "foreign main proceeding" as defined in section 1502(4) of the Bankruptcy Code.   The Bankruptcy Code provides that a foreign proceeding is a "foreign main proceeding" if it pending in the country where the debtor has the center of its main interests. 11 U.S.C. § 1517(b)(1). Many factors weigh into the center of main interests analysis, including "the location of the debtor's headquarters; the location of those who actually manage the debtor;

the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes." *In re Bear Stearns*, 374 B.R. at 127, 128 (citing *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006), *aff'd*, 371 B.R. 10 (S.D.N.Y. July 5, 2007)).

143.    Of the five Debtor companies, two are Ontario incorporated companies, Holdco and Primus Canada – including the ultimate parent.   The two Ontario companies have a registered office in Ontario.  Primus Canada is the operating company and substantially all of its employees, assets and revenue are generated in Canada.   Its senior secured creditors and subordinate secured creditors are also Canadian entities.

144.    Although the other three entities, Lingo, PTUS and Primus US – are Delaware corporations, the Debtors' business is intertwined and the Debtors share networks, platforms, infrastructure and personnel, including senior management.

145.    More particularly, certain functions are completely integrated across all Debtors. The Debtors' executive management, located in Canada, is responsible for the strategic direction of the U.S. Debtors, and the Debtors' Human Resources Department, also located in Canada, is responsible for such functions on an entity-wide basis, including for the U.S. Debtors.

146.    Further, employees of the U.S. Debtors also support Canadian operations.   For example, certain American customer care employees provide support to Canadian customers and certain American engineers assist with Canadian network support.

147.    The center of main interests for each of the Debtors' enterprises is at its headquarters in Toronto, Ontario, Canada.  A significant majority of the Debtors' revenue, 88%, comes from its Canadian operations.  The overwhelming majority of the Debtors' customers,

90%, are in Canada and all its business customers are in Canada. Most of the Debtors' operations, as a result, are in Canada, including its crucial network and co-locations. The Debtors' two primary "switch sites" are located in Toronto and Vancouver. The Debtors' U.S. locations consist of one office with four employees who support both U.S and Canadian operations in Iowa and an office in Florida that house four employees who provide customer support for the Debtors' Puerto Rico customers. There is no outstanding litigation in the United States known to the Monitor.

148.   Thus, based on the facts present in these cases, the Monitor respectfully submits that Toronto, Canada should be found to be the center of each of the Debtor's main interests. *In re Tri-Continental Exch. Ltd.*, 349 B.R. 627, 634 (Bankr. E.D. Cal. 2006) (noting that a debtor's center of main interests is the "place where the debtor conducts the administration of his interest on a regular basis and is therefore ascertainable by third parties"); *In re Fairfield Sentry Ltd.*, 440 B.R. 60, 66 (Bankr. S.D.N.Y. 2010).

149.   An order recognizing a foreign proceeding shall be entered if all of the requirements for recognition have been met. *See* 11 U.S.C. § 1517. As set forth above, the Canadian Proceeding is a "foreign main proceeding" within the meaning of section 1502(4) of the Bankruptcy Code, the Monitor qualifies as a "foreign representative" under the Bankruptcy Code, and the Petitions for Recognition meet the requirements of Bankruptcy Code section 1515. Accordingly, based on the submissions contained herein and the Meakin Declarations pursuant to section 1517(a) of the Bankruptcy Code, the Monitor is entitled to entry of an order granting recognition to the Canadian Proceeding. *See* 11 U.S.C. § 1517 (an order recognizing a foreign proceeding "shall be entered" if all of the requirements for recognition have been met).

**D.**   **Recognizing the Canadian Proceeding as a Foreign Main Proceeding is Consistent with the Purpose of Chapter 15 and Public Policy**

150.   Section 1506 of the Bankruptcy Code provides that nothing in chapter 15 shall prevent the court from refusing to take an action otherwise required therein if such actions would be manifestly contrary to the public policy of the United States. 11 U.S.C. § 1506. The Monitor submits that the relief requested is not manifestly contrary to, and is consistent with, public policy of the United States.

151.   It is well established that one of the fundamental goals of the Bankruptcy Code is the centralization of disputes involving the debtor. *See, e.g., In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 989 (2d Cir. 1990) ("The Bankruptcy Code provides for centralized jurisdiction and administration of the debtor, its estate and its reorganization in the Bankruptcy Court....") (internal quotations and citations omitted). Indeed, as one court has noted, "the firm policy of American courts is the staying of actions against a corporation which is the subject of a bankruptcy proceeding in another jurisdiction." *Cornfeld v. Investors Overseas Servs., Ltd.*, 471 F. Supp 1255, 1259 (S.D.N.Y. 1979) (recognizing that Canadian liquidation Proceedings would not violate laws or public policy of New York or the United States).

152.   The Canadian Proceeding is similar to cases under chapter 11 of the Bankruptcy Code because it provides for a centralized process to assert and resolve claims against an estate and to provide distributions to creditors in order of priority. Recognizing the Canadian Proceeding and enjoining certain actions or proceedings with respect to the Debtors and their assets will assist the orderly administration of the Debtors' assets. Such orderly administration is consistent with the public policy of the United States, as embodied in the Bankruptcy Code. Absent the relief requested, there is a possibility of potential actions being brought against the Debtors seeking to recover the assets. This could result in unnecessary enforcement costs or the piecemeal disposition of assets to the detriment of the Canadian Proceeding and the Debtors'

creditors. Avoiding such potential outcomes through the recognition of the Canadian Proceeding and enforcement of the stay granted under the Initial Order in the United States is consistent with the United States public policy and promotes the public policies embodied in the Bankruptcy Code.

153.    Further, recognition of the Canadian Proceeding is consistent with the purpose of chapter 15 and the United Nations Commission on International Trade Law ("UNCITRAL") Model Law on Cross Border Insolvency. Section 1501(a) of the Bankruptcy Code provides, in pertinent part, that:

> The purpose of this chapter is to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency with the objectives of –
>
> (1)    cooperation between -
>
> * * *
>
> > (B)    the courts and other competent authorities of foreign countries involved in cross-border insolvency cases;
>
> * * *
>
> (3)    fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor; [and]
>
> (4)    protection and maximization of the value of the debtor's assets.

11 U.S.C. § 1501.

154.    The relief requested by the Monitor is consistent with the objectives of chapter 15. Recognition of the Canadian Proceeding would foster cooperation between courts in Canada and the United States in the Debtors' restructuring proceedings. By granting recognition to the Canadian Proceeding and enforcing the CCAA stay in the United States, the Court can effectively assist the Canadian Court in the orderly administration of the Debtors' assets. The

Debtors' creditors would be enjoined from commencing or continuing actions against the Debtors and the assets of the Debtors, thereby assisting in the uniform resolution of claims against the Debtors.

155.    Additionally, recognition of the Canadian Proceeding would promote the fair and efficient administration of a cross-border reorganization procedure that protects the interests of all creditors and interested entities.  If creditors' actions with respect to the Debtors' United States assets are not effectively stayed, the uniform and orderly voluntary administration of the Debtors in the Canadian Proceeding will be jeopardized.

## CONCLUSION

WHEREFORE, the Monitor respectfully requests that this Court enter the proposed Order, substantially in the form attached hereto as **Exhibit C**, granting the relief requested herein and such other and further relief as may be just and proper.


Dated: January 19, 2016
      Wilmington, Delaware

ELLIOTT GREENLEAF, P.C.

*Rafael B/*

Rafael X. Zahralddin-Aravena (DE No. 4166)
Shelley A. Kinsella (DE No. 4023)
Kate Harmon (DE No. 5343)
1105 N. Market St., Ste. 1700
Wilmington, DE  19801
Telephone:    (302) 384-9400
Facsimile:     (302) 384-9399
Email:        rxza@elliottgreenleaf.com
Email:        sak@elliottgreenleaf.com
Email:        khh@elliottgreenleaf.com

*Attorneys for the Monitor*

## VERIFICATION OF CHAPTER 15 PETITION

Pursuant to 28 U.S.C. § 1746, Nigel Meakin declares as follows:

I am a Senior Managing Director of FTI Consulting Canada Inc. ("FTI" or the "Monitor") , the court-appointed monitor and duly authorized foreign representative for debtors-in-possession Primus Telecommunications Canada Inc., Primus Telecommunications, Inc., Lingo, Inc., PT Holdco, Inc., and PTUS, Inc. (collectively, the "Debtors"). I have full authority to verify the foregoing chapter 15 petition for recognition of a foreign main proceeding, including each of the attachments and appendices thereto, and I am informed and believe that the allegations contained therein are true and accurate to the best of my knowledge, information, and belief. A true and accurate copy of the Initial Order issued on January 19, 2016, by Ontario Superior Court of Justice (Commercial List) pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, whereby FTI is appointed Monitor and authorized to act as the foreign representative with respect to the application for recognition of the Canadian insolvency proceedings pursuant to chapter 15 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, is attached hereto as **Exhibit A**.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 19th day of January, 2016.

**Nigel D. Meakin**
Senior Managing Director, FTI Consulting Canada
Inc., in its capacity as authorized Foreign
Representative of the Debtors