IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 15 |
| | ) | |
| Eastern Continental Mining and | ) | |
| Development Ltd., | ) | Case No.: 16-_____ |
| | ) | |
| Debtor. | ) | |

### DECLARATION OF NINOS KOUMETTOU IN SUPPORT OF VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN MAIN PROCEEDING AND (II) CERTAIN RELATED RELIEF

I, Ninos Koumettou, hereby declare as follows:

1.      I am the managing director of Alexander Lawson Jacobs and have been appointed as the Liquidator of the above-captioned debtor (the "Debtor") in a proceeding (the "UK Proceeding") commenced under the United Kingdom's Insolvency Rules 1986 on or about January 13, 2016.

2.      I respectfully submit this declaration in support of the official form chapter 15 petition (the "Petition") of the Debtor, the *Verified Petition of Ninos Koumettou, as Foreign Representative of Eastern Continental Mining and Development Ltd., for (I) Recognition of Foreign Main Proceeding and (II) Certain Related Relief* (the "Verified Petition"), the *Motion for Order Scheduling Hearing and Specifying the Form and Manner of Service of Notice* (the "Notice Procedures Motion"), and the *Motion of Ninos Koumettou, as Foreign Representative of Eastern Continental Mining and Development Ltd., for an Order Granting Certain Provisional Relief* (the "Provisional Relief Motion") filed by me seeking recognition by this Court of the UK Proceeding as a foreign main proceeding.

3.      Alexander Lawson Jacobs has been engaged by the Debtor since 18 December 2015.  As a result of Alexander Lawson Jacobs' work with the Debtor leading up to the

1

commencement of the UK Proceeding, I have become familiar with the Debtor's history, day-to-day operations, assets, financial condition, business affairs and books and records. Except as otherwise indicated, all facts set forth in this Declaration are based upon: (a) my personal knowledge; (b) my review of relevant documents; (c) information supplied to me by the officers, directors and/or employees of the Debtor or other professionals retained by the Debtor, including, with respect to matters of United States bankruptcy law, information provided to me by U.S. counsel; or (d) my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. I am an individual over the age of eighteen and, if I were called upon to testify, I could and would testify competently to the facts set forth herein.

## BACKGROUND

4.      The Debtor was incorporated on May 18, 2010 under the Companies Act 2006 as a private company by the Registrar of Companies for England and Wales. The Debtor's registered office and principal place of business is located at 59-60 Cornhill, 1st Floor, London EC3V 3PD, England. The Debtor has approximately eighty shareholders and two officers - Secretary and Director Lawrence Denault and Director David Pape.

5.      Based in London, the Debtor was formed to explore and develop direct investment opportunities in the Asian raw materials and mineral resources sector. The Debtor planned to construct networks of mineral mining and collection, processing and shipping centers. Its principal focus was developing opportunities in Indonesia, with a view to exporting to other Asian economies including China, India, Japan, and Korea. As part of its commitment to sustainable development, all of the Debtor's projects were tailored to advance the interests of local communities – a key selling points to gain the support of the Indonesian government. The Debtor's micro port projects were to open isolated districts to new development opportunities,

employment opportunities and investments in local infrastructure. Additionally, the micro ports would also help reduce waste and increase productivity by bringing new levels of efficiency to an otherwise outdated trade cycle.

6.      Debtor looked at and evaluated over 100 potential projects. After identifying the ones that were potentially the most lucrative, the Debtor entered into a joint venture with the holders of six concessions for mining from the government of Indonesia, all of which were located on the islands of Sumatra and Java.  The Debtor's plan was to focus initially on establishing mining and related operations for the mining of iron sand on Java.  Iron sand mining is the fastest and least capital intensive way to enter the mining sector, and iron sands contain high amounts of iron and other valuable minerals and metals.

7.      After generating revenues through its iron sand concession on Java, Debtor planned to mine for iron ore on an adjacent concession and prepare to build up additional processing for the separation and processing of titanium dioxide from the iron sands.

8.      To execute its plans, Debtor needed to raise $50 million in capital.  Signet Group LLC ("SG") indicated that it had the unique capability to raise the required funds for the Debtor. In connection with its efforts to raise such funds, Debtor spent substantial sums, mainly through payments to SG, entities affiliated with SG and/or entities with which SG had or desired to have an ongoing working relationship.

9.      Both Debtor and SG determined that, if the $50 million could be raised, within 12 months of the commencement of the iron sand project, Debtor would have a profit of $4 million. Debtor and SG further determined that in the ensuing years, Debtor could, through its iron sands concession, expect to have profits of $19 million to $78 million per year.

10.    SG proposed to raise the required funds by: (a) assembling and acquiring a pool of life insurance policies; (b) forming an entity to issue $500 million in notes, the obligations of which were to be covered by proceeds from the life insurance policies; and (c) use $50 million of the $500 million in proceeds from the notes offering to provide the funding for Debtor's mining project.

11.    Unfortunately, SG was not truthful about its accomplishments and ability to raise the necessary funds.  SG wrongfully led Debtor to believe that SG had the experience and capacity to discharge its contractual obligations when SG plainly did not.  Thus, while SG led Debtor to believe that SG had a track record of success, that was not the case. In actuality, SG had never accomplished any financing of the type sought by Debtor.  Debtor would not have entered into agreements with SG and incurred over $1 million in costs if SG had not misled Debtor about SG's accomplishments.

12.    Further, SG breached its obligations under its retention agreement (the "Retention Agreement") with the Debtor.  Based on the plain language of the Retention Agreement, SG made binding commitments to Debtor to perform the services "necessary or appropriate ... for the acquisition of" interests in 600 or more life insurance policies and/or to "assure" the acquisition of such policies.  These commitments went to the heart of the services that SG was to provide. Without the assets that were to serve as the source of payments of the notes to investors, the notes could not be issued, and thus the funds that were to be ·loaned to Debtor to finance its mining project could not be raised.  Despite its commitments, SG never performed its duties. SG did not, as it was required to do, perform those services "necessary or appropriate, applying normal and customary industry standards, for the acquisition" of approved assets, nor did it "assure" the acquisition of the Approved Assets.

4

13.    SG's failure to fulfill its obligations the Retention Agreement has resulted in multi-million dollar losses to Debtor. If SG had performed the services necessary to acquire and/or "assured" the acquisition of the source of payments for the notes (i.e., the pool of life insurance policies), there would have been no reason for the issuance of the notes, and the funding of Debtor's mining operations, not to occur. It was SG's failure in this regard that prevented the financing of Debtor's project from occurring.  Debtor lost the opportunity to participate in the joint ventures that had been granted concessions by the government of Indonesia.

14.    SG appears to have discontinued its business and transferred its assets and operations to Cygnus LS, LLC.  Debtor asserts that this business scheme was an attempt by SG and its principals to hide assets and avoid making payment to Debtor.

15.    On or about March 22, 2013, the Debtor filed a complaint in the Southern District of New York against SG and several of its individual principals alleging breach of the Retention Agreement and fraudulent misrepresentation.  An amended complaint was filed to add Cygnus LS, LLC as a party.  SG filed a counterclaim against the Debtor alleging that the Debtor had breached the Retention Agreement and owes SG in excess of $250,000.  Although several of the parties have since been dismissed from the litigation, the case is currently scheduled for trial beginning March 8, 2016.

16.    As the Debtor was never able to obtain the financing necessary to conduct its operations, on or about January 13, 2016, the Debtor's shareholders voted to voluntarily wind up the company pursuant to the United Kingdom's Insolvency Rules 1986 and appointed me as liquidator and foreign representative of the company.  True and correct copies of the special resolution and ordinary resolution and related documents initiating the winding up of the

5

company are collectively attached hereto as Exhibit "A".    After my appointment, I directed the

filing of a voluntary petition under Chapter 15 of the Bankruptcy Code in this Court.

## REQUEST FOR FINAL RECOGNITION

17.    I have filed, concurrently herewith, the Verified Petition, which seeks final relief

in aid of the UK Proceeding and recognition and enforcement in full of the UK Proceeding in the

United States.    As set forth in the Verified Petition, this Court should recognize the UK

Proceeding as a "foreign main proceeding," as defined in section 1502(4) of title 11 of the

United States Code (the "Bankruptcy Code").    First, this Chapter 15 case has been commenced

by a duly authorized foreign representative.    In addition, the Bankruptcy Code provides for

recognition of a foreign proceeding as a "foreign main proceeding" if such foreign proceeding is

a "foreign proceeding" pending in the country where the debtor has its "center of its main

interests." *See* 11 U.S.C. § 1517(b )(1).

18.    I have been authorized by the Debtor under relevant United Kingdom law to wind

up the Debtor's business and liquidate the Debtor's assets.    I have been appointed as liquidator

and foreign representative and directed to commence this Chapter 15 case, and (b) requested that

all courts make such orders and provide assistance to me as may be necessary and desirable to

give effect to the UK Proceeding.    It is my understanding that for these reasons, I satisfy the

definition of a "foreign representative" as that term is defined in section 101 (24) of the

Bankruptcy Code.

19.    The UK Proceeding is a "foreign proceeding" as it is a collective administrative

proceeding authorized under the relevant laws of the United Kingdom and, if necessary, subject

to the supervision of a UK administrative agency. It is my understanding that for these reasons,

the UK Proceeding qualifies as a "foreign proceeding" as that term is defined in section 101(23)

of the Bankruptcy Code.

20.    England is the center of the Debtor's main interests. A review of the following (non-exhaustive) list of corporate functions supports a finding that the Debtor's center of main interest is located in London, England:

(a)    The location of the corporate head offices of the Debtor is in London;

(b)    All key strategic and operating decisions for the Debtor are made at the Debtor's main office in London;

(c)    Virtually all key senior management are located in London;

(d)    All key and strategic corporate functions are performed in London, including treasury, corporate finance and accounting, communications and investor relations, information technology and new business development;

(e)    All books, records and key documents (including leases, insurance and other key corporate documents) are negotiated and maintained in London;

(f)    Accounts receivable and accounts payable for the Debtor are managed from London; and

(g)    The Debtor's primary banking, lending, cash management, audit and legal relationships are all with firms located in England.

21.    Based on these facts, it is my understanding that the Debtor's center of main interest is in England and the UK Proceeding is therefore a foreign main proceeding as that term is defined in section 1517(b)(1) of the Bankruptcy Code.

22.    In compliance with section 1515(c) of the Bankruptcy Code, my counsel has advised me regarding the definition of "foreign proceeding" in the Bankruptcy Code and, to the best of my knowledge, the UK Proceeding is the only "foreign proceeding," as such term is

defined in 11 U.S.C. § 101(23), pending with respect to the Debtor.

## REQUEST FOR PROVISIONAL RELIEF

23.     I have also filed, concurrently herewith, the Provisional Relief Motion for entry of a provisional order: (i) recognizing and enforcing in the United States, on an interim basis, the UK Proceeding, (ii) granting an interim stay of execution against the Debtor's assets and applying sections 362 and 365(e) of the Bankruptcy Code in this Chapter 15 case.  As set forth in more detail in the Provisional Relief Motion, I am seeking the provisional relief because it is necessary to avoid irreparable harm.

24.     As set forth in the Provisional Relief Motion, the Debtor is currently involved in litigation in the United States. Accordingly, it is my belief that, unless the protections of section 362 of the Bankruptcy Code are immediately applied in this Chapter 15 case, the Debtor could face immediate and irreparable harm resulting from the litigation currently pending in the United States against the Debtor.  Absent the provisional relief requested, default judgments could be entered against the Debtor which could disrupt my efforts to wind down and liquidate the Debtor's assets in an orderly fashion.  I believe that the threat of such disruption as well as the legal cost of defending additional litigation in different jurisdictions, may have a severe and adverse impact on the Debtor and its stakeholders.

25.     I believe that the entry of an order granting provisional relief will not harm the Debtor's creditors. The provisional relief will be in place for only a short time, and affected parties would be able to seek relief, if necessary, in this Court. Moreover, the provisional relief will facilitate the Debtor's preservation of its assets for creditors. Accordingly, I believe that the balance of harms weighs in favor of granting the provisional relief.

## THE NOTICE PROCEDURES MOTION

26.     The relief sought in the Notice Procedures Motion is warranted in this Chapter 15 case. The Debtor's creditors, potential creditors, and other parties in interest will need to be provided with notice of, among other things, the filing of this Chapter 15 case, the order on the Provisional Relief Motion, the deadline to object to recognition of these Chapter 15 case, and the hearing date for recognition of the Chapter 15 case. I believe the notice procedures set forth in the Notice Procedures Motion represent a cost-effective method to effectively handle service in this case.  Accordingly, I believe entry of an order granting the relief requested in the Notice Procedures Motion is in the best interest of the Debtor and all parties in interest.

## CONCLUSION

Based on the foregoing, I believe that the relief requested in the Debtor's ancillary Chapter 15 case is well-justified, necessary under the circumstances, in the best interests of the Debtor and its creditors and should be granted in full.


I certify pursuant to 28 U.S.C. § 1746 under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information and belief.


Date: January 18, 2016

Ninos Koumettou
Liquidator and Foreign Representative